**Clyde C. GOMM, Plaintiff,**

v.

**Gary DeLAND, Director, Dept. of Corrections of the State of Utah; et al., Defendants.**

**No. 86–C–887A.**

United States District Court, D. Utah, C.D.

Jan. 12, 1990.

Steve Russell and Kathryn Collard of Collard & Russell, Salt Lake City, Utah, for plaintiff.

R. Paul Van Dam, Atty. Gen., Scott McAlister, Sp. Asst. Atty. Gen., Kent Barry, Asst. Atty. Gen., and C. Dane Nolan, Asst. Atty. Gen., of the Utah State Atty. General's Office, Salt Lake City, Utah, for defendants.

MEMORANDUM ORDER AND DECISION (In Lieu of Findings of Fact and Conclusions of Law—Fed.R.Civ.P. 52(a))

ALDON J. ANDERSON, Senior District Judge.

## INTRODUCTION

The plaintiff, Clyde C. Gomm (the plaintiff or "Gomm"), an inmate at the Utah State Prison ("USP"), filed this § 1983 action against various employees of the Utah State Department of Corrections and the USP alleging that the defendants subjected him to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Specifically, Gomm complains of the medical care, or the lack thereof, that he received while an inmate at the USP. He also alleges that several members of the transportation department caused him unnecessary pain while transporting him to his medical appointments outside the prison.

Named as defendants are Gary DeLand, Director, Utah State Department of Corrections ("DeLand"); Gerald Cook, Warden, USP ("Warden Cook"); Blen Freestone,

Medical Director, USP ("Freestone"); John Middleton, M.D., a doctor at the USP ("Dr. Middleton"); Eric Call, Nurse Practitioner at the USP ("Call"); and Leonard Higley, Captain Karl Bartell, Marion Painter, Roger Burnett, Ronald Benson, and Carol Horlacher, all members of the transportation department at the USP.[1]

In May and June of this year, the Court presided at the non-jury trial in this matter. At the conclusion of that trial, the Court took the matter under advisement. Having now familiarized itself with the law in this area and the facts of this case, the Court is prepared to issue its ruling.

## FACTS

From the time Mr. Gomm entered prison on May 10, 1985, until the time he was released, he and his wife, Janet Gomm, continually complained to the medical department at the USP and to various officials in the Department of Corrections about Gomm's shoulder and back.[2] Upon entering prison, Gomm informed the intake personnel that he had a back problem. Gomm, I at 24.[3] On May 15th, June 24th, and July 10th, Gomm apparently went through the pill line and sick call procedures[4] and was seen by Dr. Rocky Lipsman, a part-time physician at the prison, for back and shoulder pain. Freestone, IV at 18–26. At the June 24th visit, Gomm told Lipsman that he had a history of dislocating his right shoulder and often experienced pain in that area. Id. at 26. Gomm himself testified that he had experienced problems with his right shoulder prior to entering prison and had received cortisone shots for this problem. Gomm, I at 22. Dr. Lipsman ordered an X-ray, which a doctor outside the prison evaluated. Freestone, IV at 27. The X-ray showed no broken bones or any other problem with the soft tissue. Id. at 27–28; Plaintiff's Exhibit 3.

Gomm claimed he injured his right shoulder at the prison while playing softball on July 13, 1985. Gomm, I at 26. According

---

1. During closing arguments, Mr. Russell, Gomm's attorney, stated that Gomm was dismissing the claims against Officers Benson, Higley, and Painter. Russell, XI at 90. However, this Court has not signed an order to this effect. Therefore, these defendants will be discussed along with the others.

2. Prison medical personnel saw Gomm numerous times throughout his prison stay. Only the most relevant visits will be discussed in the course of this opinion.

3. To simplify the citation in this case, the Court will refer only to the person who testified, the volume of the record, and the page number of that volume. Because several reporters transcribed portions of the proceedings, the record is not numbered consecutively. Therefore, the Court will refer to the record as follows:

| | |
|---|---|
| May 15, 1989 transcript | Volume I |
| May 16, 1989 transcript | Volume II |
| May 17, 1989 transcript | Volume III |
| May 22, 1989 transcript (Patti Walker, Reporter) | Volume IV |
| May 22, 1989 transcript (Ellis E. Christensen, Reporter) | Volume V |
| May 23, 1989 transcript (Laura W. Robinson, Reporter) | Volume VI |
| May 23, 1989 transcript (Karen Murakami, Reporter) | Volume VII |
| May 24, 1989 transcript | Volume VIII |
| May 31, 1989 transcript (Laura W. Robinson, Reporter) | Volume IX |
| May 31, 1989 transcript (Patti Walker, Reporter) | Volume X |
| June 6, 1989 transcript | Volume XI |

In addition, part of the May 17, 1989 proceedings, and the entire day on May 18, 1989, were not transcribed. The Court did, however, listen to the reporter's tape recordings for these days. Testimony from these days will simply be cited to as Tape.

4. Twice a day at the prison, the medical department conducts a pill line. Freestone, IV at 13. Inmates with a medical complaint at the USP must register their complaints with the pill line personnel. Id. at 14. The pill line is used to pass out prescribed medication, to provide an opportunity to the inmates to see medical personnel, and to make the medical staff aware of medical complaints. Id. at 13–14. The pill line is staffed by registered nurses, correctional medical assistants, nurse practitioners, and physician assistants. Id. at 15–16. All requests to see a doctor also go through the pill line. Id. In the event of an emergency, however, a doctor will try to see the inmate right away. Id. at 12–13. If an inmate requests to see a doctor, the person running the pill line will either refer the inmate to "sick call" to see a nurse practitioner or examine the inmate himself. Id. at 17. Then, if necessary, the nurse practitioner refers the inmate to a doctor. Id. at 18.

to his testimony, he tripped and his shoulder landed on a steel sprinkler head. He heard a crack and was knocked out. *Id.* Gomm was taken to the infirmary and seen by defendant Call. Gomm, I at 26; Freestone, IV at 32. Call had an X-ray taken and determined that the shoulder was broken. Gomm, II at 201. For treatment, Call put Gomm's right arm in a sling and gave Gomm a painkiller. *Id.;* Gomm, I at 27; Middleton, VII at 19. Four days later, on July 17, 1985, Dr. Middleton, a part-time physician at the USP, examined Gomm. Middleton, VII at 19. He reviewed the X-ray and saw no fracture,[5] but diagnosed Gomm as suffering from a bruised shoulder and a possible acromioclavicular ("AC") joint strain.[6] *Id.* at 19–20. He prescribed Naprosyn, an anti-inflammatory drug, *id.* at 20, and told Gomm to continue using the sling that Call had recommended.[7] Gomm testified that the sling hurt him, but Dr. Middleton said that pain is often present with treatment, and pain by itself is not sufficient reason to change the method of treatment. *Id.* at 18–19. On July 20th, Gomm again saw Call complaining that he had reinjured his arm on a door. Gomm, II at 207. Call prescribed Darvon for pain and told Gomm to continue wearing the sling. Freestone, IV at 34.

In early August, 1985, Gomm went before the Board of Pardons for a hearing. Gomm, I at 28. At the hearing, Dr. Dennis H. Gordon, Gomm's personal physician and an orthopedic surgeon, testified as to Gomm's physical problems in connection with Gomm's request that the Board of Pardons release him from prison. Gordon, I at 82, 143. During a recess at the hearing, at Gomm's request, Dr. Gordon examined Gomm's shoulder. *Id.* at 82. The examination took place in a hall while Gomm was in restraints. *Id.* From this brief examination, Dr. Gordon diagnosed Gomm as having a third-degree separation of the AC joint. *Id.* at 83; *see also* Plaintiff's Exhibit 8 (Letter from Dr. Gordon to Warden Cook stating that Gordon believes Gomm has a "grade 3 separation of the right acromioclavicular joint"). Dr. Gordon and Gomm relayed this information to Dr. Middleton, but Dr. Middleton, after examining Gomm again, disagreed with Dr. Gordon's diagnosis as to the extent of Gomm's shoulder injury. Middleton, VII at 23; Plaintiff's Exhibit 1 (8/9/85 entry). To be sure, however, and because the question had been raised by an orthopedic surgeon, Dr. Middleton ordered the "definitive test for this condition." Middleton, VII at 24. This test consists of X-rays with and without weights. *Id.* Dr. Middleton testified that these X-rays showed the separation in Gomm's right shoulder joint was not a third degree separation. *Id.* at 25. The X-rays reaffirmed his belief that the separation was second-degree, and that his treatment of immobilization and anti-inflammatory medication was correct. *Id.* at 26–27. Further, he believed that surgery was not the proper course. *Id.* at 28.[8]

Dr. Gordon wrote Warden Cook on September 25, 1985, recommending surgery and stating that the prison's treatment of

---

**5.** Dr. Middleton testified that in January, 1986, he received an X-ray report from the University of Utah Medical Center which showed that Gomm indeed suffered from a coracoid fracture. Middleton, VII at 22. However, he also testified that he would not have changed Gomm's treatment had he known this in July—he would still have used a sling—although he *might have consulted with a specialist at the UMC. Id.* at 23.

**6.** The prison medical department sent the X-ray to Dr. Halverson, an outside radiology consultant, who confirmed the existence of an AC separation. Freestone, IV at 33. However, Dr. Halverson found no evidence of a fracture. Plaintiff's Exhibit 4.

**7.** There was some confusion as to whether Gomm was placed in an "AC strap" or a "sling and a swathe." Dr. Middleton testified that Gomm was placed in the latter setup. Middleton, VII at 16. He explained that the AC strap was not used in this instance because the patient must wear the strap at all times and "very few people can actually do that in practice." *Id.* at 17. The sling and swathe used on Gomm immobilized the shoulder, supported the forearm, and held his right arm close to his body. *Id.* at 16.

**8.** Dr. Gordon testified that assuming Dr. Middleton was correct in his diagnosis that Gomm suffered only from a second-degree separation, then Dr. Middleton's treatment was appropriate. Gordon, I at 155.

Gomm was inadequate. Gordon, I at 89; Plaintiff's Exhibit 8. Warden Cook testified that he had no authority over the medical department, Cook, IX at 61, but passed the information on to the medical department, probably to Freestone, and asked them to look into the matter as it was their responsibility. *Id.* at 66.

On October 21, 1985, the prison sent Gomm to the University of Utah Medical Center ("UMC") where Dr. Alan P. Newman, an orthopedic surgeon, examined Gomm's shoulder.[9] Freestone, IV at 38; Newman, III at 4. Dr. Newman testified that in his opinion, according to his examination and the X-rays which he reviewed, Gomm had a separated shoulder, a fractured coracoid process (shoulder blade), and also suffered from degenerative arthritis in his AC joint. Newman, III at 6, 10. Dr. Newman disagreed with Dr. Gordon's diagnosis that Gomm suffered from a third degree separation, and did not think Gomm needed surgery at that time.[10] *Id.* at 11–12. Dr. Newman prescribed Clinoril, an anti-inflammatory drug, recommended that Gomm start some physical therapy [11] and return in six weeks for follow-up. *Id.* at 7–9.

Gomm did not return in six weeks, and in fact missed an appointment that was scheduled for early December. *Id.* at 9; Testimony of Lynn Lund, Tape. During Decem-

ber, Mrs. Gomm and Dr. Gordon continued their attempts to obtain surgery for Gomm. Mrs. Gomm scheduled surgery with Dr. Gordon's office, but this surgery did not take place. Gordon, I at 90. Mrs. Gomm testified that Warden Cook told her to schedule the surgery after Mrs. Gomm assured him that the Gomms had insurance to pay for the surgery. Testimony of Mrs. Gomm, Tape. She further testified that someone at the prison notified her in the middle of December that the surgery could not take place. *Id.* The rationale behind this decision was that, because of Gomm's inmate status at the prison, a guard had to be present at all times when Gomm was away from the prison. *Id.* Although the UMC is equipped to handle the security problems inherent with prisoners, and the prison will supply guards when the prisoner goes to the UMC, Dr. Gordon wanted to perform the surgery at another hospital which the prison did not routinely use. *Id.* Mrs. Gomm testified that after she was informed of this change Warden Cook suggested that Mrs. Gomm attempt to have Gomm's inmate status changed so that a guard would not be needed. *Id.* She attempted to effect this change by contacting the Board of Pardons and Gomm's caseworker at the prison, Lewis Wright, but was rebuffed by everyone. *Id.* The end

---

**9.** The prison does not have facilities at the prison to provide for all medical needs. Therefore, the USP has contracted with the UMC as a referral hospital to provide medical care that the prison cannot provide. Physicians, nurse practitioners, and physician assistants at the prison refer inmates to the UMC when "an inmate needs to be treated by a specialist or requires treatment beyond what [the prison] can provide in the infirmary." Freestone, IV at 40. Any of these individuals, plus Freestone at their direction, can fill out a consultation request authorizing a referral. *Id.* at 40–41.

**10.** Dr. Newman testified that most coracoid fractures heal on their own, and most AC separations do well with non-operative treatment. Newman, III at 11.

**11.** Apparently this physical therapy never started. Dr. Newman did not specify on the sheet that returned to the prison what type of physical therapy he wanted Gomm to perform, and the prison assumed that Dr. Newman would have

given specific instructions to the prison had he felt they were necessary. Freestone testified that the usual practice with the UMC is that if the doctor wants the inmate to perform physical therapy at the UMC then the doctor will specify this on the consultation form that is returned to the prison. Freestone, VI at 53. If the doctor does not request a return visit, however, Freestone interprets this as meaning that the doctor has instructed the inmate on physical therapy that the inmate can do by himself. *Id.* at 53–54. Plaintiff's Exhibit 9, which is a consultation request form as described *supra* in footnote 8, shows a spot labeled "Recommended Treatment" where the treating physician can instruct the prison as to the necessary treatment.

This is but one example of something Gomm complained about in this case. One of Gomm's chief complaints is that no one from the prison medical department followed up or communicated with the UMC doctors concerning Gomm's needs. Whether the Constitution requires this type of follow-up or constant contact will be dealt with below.

result is that the surgery did not take place.

Warden Cook testified that he did not tell Mrs. Gomm to schedule surgery in December, and that he did not recall suggesting to Mrs. Gomm that getting Gomm's level changed would help obtain the surgery. Cook, IX at 75, 80. Furthermore, he testified that he turned over all information concerning Gomm's medical condition to the prison medical department because he does not have the authority to order surgery. Id. at 60–64. Warden Cook's lack of authority over medical matters was corroborated by the testimony of DeLand. DeLand, IX at 12.

Freestone testified that in December, 1985, he explained to Mrs. Gomm that if the surgery was not performed at the prison's referral hospital, the UMC, the Gomm's would have to pay for the surgery as well as the guard. Freestone, V at 37. With these conditions in mind, Freestone's position was that "As far as I was concerned they could go ahead and do the surgery." Id. Despite this conversation, Freestone was never told that surgery was scheduled. Id. at 38.

Between January and May, 1986, Gomm saw Dr. Newman and the prison doctors on several occasions.[12] Freestone, IV at 57–67, V at 1–5; Newman, III at 15–23; Middleton, VII at 33–40. At most of these appointments the doctors would examine Gomm's shoulder and modify or enhance the medication Gomm was receiving, trying to alleviate Gomm's discomfort.

In March, Dr. Newman became concerned that Gomm's rotator cuff might be torn. See Plaintiff's Exhibit 20. In April and again in May, Dr. Newman wrote two letters, one to whom it may concern, the other to Freestone, about his evaluation of Gomm. Plaintiff's Exhibits 20 and 23. In the first letter, Dr. Newman noted that he had treated Gomm conservatively up to this point. Plaintiff's Exhibit 20. He expressed concern about Gomm's rotator cuff, but recommended against an arthrogram (the definitive test for determining the existence of a torn rotator cuff) because he felt that surgery should not be performed on Gomm as he did not believe that Gomm could receive the appropriate post-operative care while in prison.[13] Id.

The second letter, addressed to Freestone, restated much of what was said in the first letter. Plaintiff's Exhibit 23. Dr. Newman again recommended against an arthrogram and against surgery. Id. "I feel [Gomm] is *not* a candidate for rotator cuff repair surgery while he is in the prison, as the results of this operation are directly related to the post-operative physical therapy which he could get. Actually, he could be worse off following surgery, if the physical therapy program was not strictly adhered to." Id. At the end of the letter, Dr. Newman wrote "I do want you to know that I am not deferring the surgery because he is in prison, but rather because the required physical therapy after surgery would be unavailable while he is in prison." Id.

Freestone interpreted both letters as an "unequivocal" clinical judgment that Gomm could not rehabilitate while in prison.[14] Freestone, IV at 67, V at 6. Because the prison had been working with the UMC for at least the ten years that Freestone had worked at the prison, he assumed Dr. Newman was familiar with what the prison could provide in terms of care for inmates,

---

**12.** Gomm's attorney at one point noted that Gomm complained to physicians about back or shoulder pain or both 36 separate times. VII at 53. Implicit in this statement is the fact that Gomm therefore saw doctors at least 36 times concerning his ailments.

**13.** According to his testimony, Dr. Newman remained opposed to surgery for Gomm until late 1986 when Freestone assured him that adequate post-operative care could be provided. Newman, III at 25. He testified that the usual procedure for a suspected rotator cuff tear is non-op-

erative treatment for approximately 3–6 months. Id. at 26. This delay will not damage the torn cuff appreciably. Id. If the non-operative treatment does not work, then an arthrogram is performed to document the torn cuff, and if the cuff is torn, surgery is performed. Id.

**14.** Dr. Middleton interpreted the first letter to mean that in Dr. Newman's professional judgment, Gomm would not benefit from surgery at this particular time. Middleton, VII at 92. Dr. Middleton could not recall seeing the second letter. Id. at 92–93.

whether directly or by transporting them to the UMC. *Id.*, IV at 67–68.

Dr. Newman's second letter suggested that Gomm perform rigorous physical therapy so that his shoulder would not freeze up. Plaintiff's Exhibit 23. On June 2nd, Gomm saw Bob Jackson, a physical therapist at the UMC. Freestone, V at 7; Plaintiff's Exhibit 24. Jackson apparently instructed Gomm on several exercises to build his shoulder muscles, but on the consultation request form that was returned to the prison he wrote that Gomm could do all the exercises on a "home basis." *See* Plaintiff's Exhibit 24. Freestone testified that this consultation form did not indicate that the prison medical staff had to perform any function in regard to Gomm's physical therapy. Freestone, V at 7.

Back in March, 1986, Gomm had filed a grievance complaining of his medical care.[15] Gomm, I at 47; Plaintiff's Exhibit 17. Freestone's response to the grievance was that Gomm had been evaluated both by prison and nonprison doctors and that no doctor had said surgery was necessary. Plaintiff's Exhibit 18. Because he was willing to pay for the surgery himself, Gomm appealed his grievance to the Inspector General's office. Gomm, I at 53; Plaintiff's Exhibit 19. Dorothy Butterfield, Ombudsperson, and Haze Locke, Assistant Inspector General, investigated Gomm's claim and on June 20th recommended that surgery be performed. Plaintiff's Exhibit 30. On June 26th, however, Gomm met with Dorothy Butterfield and, according to a letter she later wrote Gomm, asked that his grievance be continued until after

Gomm met with the Board of Pardons.[16] Plaintiff's Exhibit 32.

In June, Gomm was sent to Dr. Gordon. Gordon, I at 91–92; Plaintiff's Exhibit 27. Dr. Gordon ordered an arthrogram performed which showed that Gomm suffered from a large tear in the rotator cuff. Gordon, I at 93. At the end of June, Dr. Gordon wrote Freestone and strongly encouraged surgery, but recommended against it while Gomm was in prison. Plaintiff's Exhibit 33. Freestone interpreted Dr. Gordon's letter as meaning that Dr. Gordon did not recommend surgery. Freestone, V at 11–12.

In September, one of the members of the medical department at the prison asked Freestone to schedule surgery for Gomm's shoulder. *Id.* at 16; Plaintiff's Exhibit 1 (9/15/86 handwritten entry). Also, on September 29th, Dr. Gordon wrote a letter to whom it may concern detailing the type of post-operative therapy that Gomm would need. Plaintiff's Exhibit 40. This was apparently the first time any doctor had told Freestone or anyone else at the prison specifically what Gomm would need by way of post-operative care. According to Freestone, he believed that the prison could accommodate the requests Dr. Gordon made in his letter, and began working toward a surgery date for Gomm. Freestone, V at 13. Freestone sent Gomm to see Dr. Newman, explaining to Dr. Newman that Gomm wanted the surgery that Dr. Gordon had recommended.[17] Plaintiff's Exhibit 44. Freestone also pointed out to Dr. Newman that Gomm's insurance would pay for all expenses related to the

---

15. Gomm also filed a grievance in August, 1985, shortly after Dr. Gordon told him he needed surgery. Gomm, I at 31; Plaintiff's Exhibit 5. This grievance was denied because in the opinion of Freestone and the investigator, Michael D. Jensen, Gomm was receiving adequate medical treatment. Plaintiff's Exhibit 7.

16. As a rebuttal witness, Gomm claimed Dorothy Butterfield suggested that Gomm postpone surgery until after the Board hearing. Gomm, X at 27. As Ms. Butterfield had already recommended surgery take place, and because her letter, Plaintiff's Exhibit 32, was created at the

time in question, the Court finds that Gomm did in fact ask for the delay. Even if he did not initially ask for the delay, Ms. Butterfield's letter shows that Gomm, at the very least, ratified the decision.

17. Gomm saw Dr. Newman on October 16th. Freestone, V at 16–17; Plaintiff's Exhibit 44. Freestone testified that the delay from the September 15th note or Dr. Gordon's letter of September 29th is not unusual; it often takes "a month or six weeks" to obtain an appointment in the orthopedic department. Freestone, V at 17.

surgery.[18]   *Id.*

Dr. Newman wrote Freestone on October 20, 1986, and informed Freestone that Gomm would need therapy as frequently as three times a week immediately after the surgery. Freestone, V at 20; Plaintiff's Exhibit 45. To make certain that transportation could comply with this need, given the concerns over the adequacy of post-operative care that the doctors had consistently mentioned, Freestone contacted Lynn Lund, the Inspector General. Freestone, V at 20; Plaintiff's Exhibit 41. Freestone did this because he wanted someone with authority to ensure that the transportation department could transport Gomm as needed, and make the transportation a top priority. Freestone, V at 20.

Lynn Lund conducted an investigation and determined that Gomm should have the surgery. Plaintiff's Exhibit 46. According to Lund's testimony, after Lund brought DeLand up to date on Gomm's situation, DeLand told Lund to proceed with the surgery unless surgery clearly was not needed. Testimony of Lynn Lund, Tape. Lund relayed this instruction to Freestone. *Id.*

Having assured himself that the surgery was recommended by someone high enough in the Department to ensure that Gomm's transportation's needs would be met, Freestone scheduled surgery with Dr. Newman. Dr. Newman performed surgery on Gomm on December 2, 1986. Newman, III at 30; Defendant's Exhibit 14. Dr. Newman repaired the rotator cuff tear, and also performed some procedures designed to alleviate Gomm's arthritic problem in his AC joint. Newman, III at 31.

Following the surgery, Gomm visited the UMC for several months for follow-up therapy. The prison medical department relied on Dr. Newman's instructions regarding therapy, and the UMC's physical therapy department conducted the physical therapy. Freestone, V at 22–23. Gomm attempted to show that he missed several of these appointments because of the fault of the transportation department. Freestone testified, however, that he could recall only one or two missed therapy appointments, and on at least one of these occasions the UMC cancelled. *Id.* at 27. Further, he stated that these misses "were done with knowledge of forethought," apparently meaning that the medical department knew before the appointment that the appointment would not be kept. *Id.* When transportation had a scheduling problem, someone from that department would notify Freestone and Freestone would check with the UMC. *Id.* at 27–28. If the UMC said that Gomm could not miss his appointment, Gomm was then sent despite transportation's request. *Id.* at 28. If the therapist at the UMC allowed, Gomm's appointment was rescheduled for later in the week. *Id.* Freestone emphatically testified that because of the concern which existed prior to the operation that Gomm receive adequate post-operative therapy, Freestone made sure that Gomm was either sent to his appointment or the UMC agreed to a rescheduled appointment. *Id.*

Gomm also complains about the method in which the prison transportation department transported him while going to and from the UMC. He claims that he was transported with his right hand restrained by handcuffs, and at times in a "black box." Gomm, I at 69–77. The result, he testified, was pain and discomfort. *Id.* at 75. Gomm complained to Dr. Newman at one of his visits and Dr. Newman gave Gomm a prescription stating that Gomm's right arm should not be handcuffed. *Id.* at 70; Plaintiff's Exhibit 48. Gomm testified that he carried this prescription with him at all times and showed it to several members of the transportation department, but that they ignored it and continued to restrain his right arm. *Id.* at 74.

Officer Carol Horlacher, the transportation officer who transported Gomm to the UMC on the day Dr. Newman gave Gomm the prescription, did not recall receiving or

---

**18.** Freestone testified that he put this note on the consultation request form to alleviate any concerns Dr. Newman may have had about payment. Freestone, V at 18. The prison pays for hospital services at the UMC, but apparently does not pay for services rendered by UMC doctors. *Id.* at 4, 18.

reading the prescription.[19] Testimony of Horlacher, Tape. She testified that she usually did not read what the doctor gave to her, but that if she had received a prescription she would have returned it to the medical department. *Id.*

Freestone testified that he did not know of the prescription until this litigation ensued.[20] Freestone, V at 25. He was apparently out of town when Gomm received the prescription from Dr. Newman.[21] *Id.* Furthermore, Freestone could not recall a specific conversation with Gomm concerning how Gomm was being handcuffed. *Id.* at 26. Had such a conversation occurred, or had Freestone been aware of the prescription, he would have verified the prescription with the doctor who wrote the prescription and then contacted the transportation department and instructed them how to transport Gomm in keeping with the doctor's orders. *Id.* at 26–27.

Every transportation officer who testified at trial stated that they never saw a prescription concerning Gomm's restraints. Testimony of Horlacher, Tape; Testimony of Painter, Tape; Benson, VIII at 56; Higley, VIII at 62; Bartell, VIII at 75; Burnett, IX at 86–87. Officers Benson and Higley heard about the prescription from someone and called the medical department[22] to ask whether an order existed.[23] Benson, VIII at 56; Higley, VIII at 62. Neither was informed that a prescription existed, however. *Id.* Captain Bartell,

who was in charge of the transportation department for a period during the events in question, testified that he knew of the prescription but never received an instruction from the medical department or his superiors concerning Gomm's restraints.[24] Bartell, VIII at 75.

Because the prescription apparently fell through the cracks in the medical department, Gomm continued to be transported with his right arm restrained. At times he was restrained with his hands behind his back, Benson, VIII at 55–56; Testimony of Kent Peterson, X at 7, and at times the black box was used. Benson, VIII at 58, 61; Peterson, X at 8. According to Gomm and another prisoner who traveled with Gomm to the UMC, these procedures caused Gomm great pain. Gomm, I at 76; Peterson, X at 7, 9. Other guards, however, only cuffed Gomm in front. Burnett, IX at 86; Testimony of Horlacher, Tape; Testimony of Painter, Tape. Dr. Newman testified that cuffing in the front or on the side would not have been detrimental to Gomm. Newman, III at 36.

In addition to his shoulder problem, Gomm complained of back pain throughout his prison stay. At many of his appointments for his shoulder, Gomm would also ask the doctor to look at his back. Dr. Gordon, who had treated Gomm for back problems, and had operated twice on Gomm's back before Gomm entered prison,

**19.** Officer Horlacher testified that all documents relating to the inmate are given to the transporting officer and returned to the medical department at the prison. Testimony of Horlacher, Tape.

**20.** Dr. Middleton also testified that he could not recall seeing a prescription or dealing with the handcuffing problem with transportation. Middleton, VII at 93–96.

**21.** In Freestone's absence, Lloyd Gatherum and Bill Skordos were running the prison medical department. Freestone, V at 26.

**22.** Officer Benson told either Captain Bartell or Lieutenant Roger Burnett of the prescription, and they called the medical department. Benson, VIII at 56. Officer Higley called the medical department himself and did not receive any indication that a prescription existed. Higley, VIII at 62.

**23.** The other officers who testified corroborated this policy. They stated that if they had heard of a prescription, or if Gomm had shown them a prescription, they would have called the medical department.

**24.** Captain Bartell testified that the normal procedure would be for the doctor to contact the prison medical department and have the order changed. Bartell, VIII at 75–76. The medical department would then place the alteration in the cuffing procedure on the travel order or in a memo to Captain Bartell. *Id.* If this changed his normal method of restraining procedures and he felt it was a security risk, Captain Bartell would first question Freestone about the order and then, if necessary, take the matter up with his superiors. *Id.* at 76. However, he testified that this did not occur in this case. *Id.*

testified that Gomm's back condition is degenerative, continually worsening. Gordon, I at 187.

The doctors at the prison and Dr. Gordon examined Gomm's back on occasion. In June, 1986, when Dr. Gordon examined Gomm's shoulder, Dr. Gordon injected Gomm's lower back with a long-acting local anesthetic. Plaintiff's Exhibit 33. Through 1985, 1986, and the early part of 1987, Dr. Middleton testified that he believed Gomm suffered from no acute back problem, and treated Gomm's pain and stiffness with anti-inflammatory medication, painkillers, and muscle relaxants. Middleton, VII at 30, 37, 46, 48. At these appointments, Dr. Middleton or another prison doctor would give Gomm a neurological exam. They would use a dull and a sharp instrument to determine if Gomm could detect sensation, and check the strength of his muscles and his reflexes in his lower extremities. Schackel, VIII at 84–85; Middleton, VII at 46. In addition, Dr. Middleton questioned Gomm about his bowel and bladder functions. Middleton, VII at 50.

Dr. Middleton testified that he never saw any sign of nerve impingement, Middleton, VII at 50, and believed Gomm suffered from chronic back pain. See, e.g., id. at 30, 37, 46, 48. Furthermore, Gomm's back appeared stable to Dr. Middleton as he never saw any sign of deterioration. Id. at 50. Although Gomm complained of back problems for over two and one-half years, in Dr. Middleton's medical judgment Gomm did not need surgery or to see a specialist. Id. at 105.

In July, 1987, Dr. Gregory Schackel, a doctor who began working at the prison in June, 1987, examined Gomm twice for back complaints. Schackel, VIII at 84–85, 91–

92. After performing the tests described above, Dr. Schackel agreed with Dr. Middleton's diagnosis of chronic back pain and continued the outlined treatment of medication. Id. at 86–87, 95. On September 18, 1987, however, Dr. Schackel examined Gomm again and found weakness in some muscles and detected a change in his reflexes. This suggested a possible disc compression and Dr. Schackel felt a referral to a specialist was warranted. Id. at 97–98. Dr. Schackel referred Gomm to Dr. Gordon because Dr. Gordon had treated Gomm's back in the past and Gomm was interested in continuing the relationship with Dr. Gordon.[25] Id. at 98.

Dr. Gordon examined Gomm's back in October and again in November. Freestone, V at 45–46; Plaintiff's Exhibits 55 and 56. He wrote Freestone and recommended further evaluation of Gomm's back.[26] Plaintiff's Exhibit 57. A CT scan was performed on Gomm on December 22, 1987, which showed a severe spinal stenosis in the lumbar region of the spine. Gordon, I at 114; Plaintiff's Exhibit 58. In February, Dr. Gordon saw Gomm again.[27] Plaintiff's Exhibit 61. He testified that at this time he felt surgery was required. Gordon, I at 121. On the bottom of the consultation request form for this February visit, Dr. Gordon wrote that he would write a letter and schedule surgery. Plaintiff's Exhibit 61. On March 8, 1988, Gordon wrote the prison (to whom it may concern) and directly recommended surgery. Plaintiff's Exhibit 66.

In response to Dr. Gordon's evaluation and diagnosis,[28] Freestone sent Gomm to the UMC neurology clinic for evaluation. Freestone, V at 53. He testified that because Dr. Gordon was Gomm's private physician that the prison wanted a second opin-

25. Gomm had continued this relationship even before this time. In August, 1987, Gomm saw Dr. Gordon for follow-up on his rotator cuff tear. Plaintiff's Exhibit 53. Dr. Gordon sent no instructions back to the prison regarding Gomm's back at this time. Id.

26. Despite this observation, Dr. Gordon cancelled two appointments to see Gomm in November. Freestone, V at 47–48; Defendant's Exhibit 25.

27. Following this visit, relying on Dr. Gordon's advice, see Plaintiff's Exhibit 64, the prison relieved Gomm of his work duties. Plaintiff's Exhibit 62.

28. Freestone could not recall at trial when he saw Dr. Gordon's March 8th letter. Freestone, V at 54–55.

ion using their own system. *Id.* at 53–54. Freestone was concerned, however, because of Dr. Gordon's recommendation for surgery, that the UMC see Gomm as soon as possible. *Id.* at 54.

On April 14, 1988,[29] Dr. Sharon Lynch, a neurologist,[30] examined Gomm at the UMC. *Id.* She postponed her diagnosis because she wanted to examine Dr. Gordon's CT scan, and also obtain an EMG. *Id.* at 55; Plaintiff's Exhibit 67. After reviewing the EMG[31] and examining Gomm again on May 26th, Dr. Lynch recommended the prison send Gomm to a neurosurgeon for surgery. Freestone, V at 58; Plaintiff's Exhibits 68 and 70. In a letter addressed to Freestone's assistant, Bill Skordos, Dr. Lynch noted that Gomm would benefit from surgery, but that "this surgery is not an emergency." Plaintiff's Exhibit 70.

Freestone scheduled an appointment for Gomm with Dr. Daniel W. Fults, a neurosurgeon at the UMC. Freestone, V at 60. Dr. Fults examined Gomm on June 30th, but wanted to see the CT scan and review recent X-rays of Gomm's back.[32] *Id.* at 60. Dr. Fults examined Gomm again on August 16, 1988, and recommended surgery. *Id.* at 61–62; Plaintiff's Exhibit 76.

On August 17th, the day after Gomm returned from seeing Dr. Fults, someone in the prison medical department called Dr. Fults' office and scheduled surgery. Freestone, V at 62; Plaintiff's Exhibit 76 (handwritten note at bottom says "Called Dr. Fults office on 17 Aug 88 0530 for surgery date"). Although Freestone and the medical staff were prepared to have the UMC perform this surgery at state expense, apparently Mrs. Gomm wanted Dr. Gordon to perform the surgery. Freestone, V at 65. Freestone acquiesced to Mrs. Gomm's request and made arrangements for Dr. Gordon to perform surgery at St. Mark's Hospital. At the Gomms' expense, Dr. Gordon performed the surgery in early November, 1988.[33] *Id.;* Plaintiff's Exhibit 81.

Following this surgery, Gomm experienced complications. Gordon, I at 129. Dr. Gordon felt that only one of two doctors in the country could fix Gomm's problem, and recommended sending Gomm to a doctor in Texas. *Id.* at 130. Mrs. Gomm asked the prison to pay for the expense of going to Texas, but Freestone informed her that the prison's policy was that once the Gomms started using their own private physicians that they had to bear all expenses. Freestone, V at 69. Had the Gomms and Dr. Gordon not insisted on sending Gomm to Texas, Freestone would have sent Gomm to a UMC specialist. *Id.*

Mr. Gomm testified that he was in constant pain from his shoulder and back problems until the respective surgeries were performed. Gomm, X at 24–26. However, he also claims that the prison's delay in performing these services caused him irreversible damage that will affect his ability to work in the future. *Id.* at 26.

## DISCUSSION

Gomm's suit is premised on 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West*

---

**29.** Freestone testified that the delay was due to obtaining an appointment with the UMC neurology clinic. Freestone, V at 55.

**30.** Dr. Schackel explained that a neurologist is often used to evaluate whether the patient needs surgery because the neurologist does not actually perform surgery and therefore renders an unbiased opinion. Schackel, VIII at 110.

**31.** The EMG was originally scheduled for April 29th, but the UMC cancelled this appointment. Freestone, V at 57–58. The EMG was performed on May 17, 1988. *Id.* at 58.

**32.** Counsel for Gomm attempted to demonstrate the prison's indifference to Gomm's needs by arguing that the prison failed to send these documents with Gomm when he went to see Dr. Fults the first time. However, Freestone testified that the prison did not have possession of these documents and that it would not have been possible for him to send them with Gomm. Freestone, V at 61.

**33.** Gomm's inmate classification changed from the time of his shoulder problems so that a guard was not needed during his stay at St. Mark's Hospital. Testimony of Lynn Lund, Tape.

*v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (citations omitted).[34] There can be little doubt that the defendants in this case acted under color of state law. *See, e.g., id.* at 2260 (A physician who is under contract with the state to provide medical services to inmates on a part-time basis acts under "color of state law" within the meaning of 42 U.S.C. § 1983 when he treats an inmate). The harder question then is whether Gomm's constitutional rights were violated.

Gomm complains that the defendants subjected him to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the federal Constitution. To make out a violation of the Eighth Amendment, Gomm must establish and prove two elements. First, he must show that his medical needs were serious and, second, that the defendants were deliberately indifferent to Gomm's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

■ A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Although there is some question as to whether, and when, Gomm's conditions became "serious" under this standard, the Court need not decide this first issue as it is convinced that the defendants were not deliberately indifferent to Gomm's needs.

Like other famous oxymorons in law, the term "deliberate indifference" "evades rather than expresses meaning." *Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). Although the state of Utah has a constitutional obligation to provide adequate medical care to those whom it incarcerates, *see Atkins*, 108

S.Ct. at 2258, deciding when adequate medical care has been provided is a difficult question.

■ Implicit in the *Estelle* court's formulation of deliberate indifference is an analysis of, or an emphasis upon, the defendant's state of mind. The *Estelle* court used terms such as "deliberate" and "intentional," *see Estelle*, 429 U.S. at 104–05, 97 S.Ct. at 291–92, while other courts have required knowledge. *See Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir.1985). These cases make clear that an inmate complaining of his medical care must establish by a preponderance of the evidence (1) that a defendant prison officer knew of the prisoner's serious medical condition and (2) deliberately or intentionally acted or refused to act in response to that condition, (3) and that such conduct caused the harm or unnecessary pain and suffering complained of. Of course, inaction may be deliberate indifference where the prison officer simply ignores the prisoner's medical condition. In addition, where several officers as named as defendants, as in the present case, the plaintiff must establish all elements as to each defendant.

Consistent with the requirement of deliberateness, courts have refused to find deliberate indifference where the prison official acted only with negligence toward the prisoner.

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' *Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.* Medical malpractice does not be-

---

**34.** Gomm does not specify in his complaint whether he is suing the defendants in their official or personal capacities. Nevertheless, Gomm cannot maintain his § 1983 action against the defendants in their official capacity. The Supreme Court recently ruled that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dept. of State Police*, —— U.S. ——, ——, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989).

come a constitutional violation merely because the victim is a prisoner. *Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 291–92 (emphasis added). In *Whitley v. Albers*, the Supreme Court further explained the distinction between negligence and deliberate indifference.

To be cruel and unusual punishment, conduct that does not purport to be

punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. This reading of the [Cruel and Unusual Punishment] Clause underlies our decision in *Estelle v. Gamble*, [429 U.S. at 105–106, 97 S.Ct. at 291–292], which held that a prison physician's "negligen[ce] in diagnosing or treating a medical condition" did not suffice to make out a claim of cruel and unusual punishment. It is *obduracy and wantonness*, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.

*Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (emphasis added).

In *Estelle*, the prisoner injured his back when a bale of cotton fell on him while unloading a truck. *Estelle*, 429 U.S. at 99, 97 S.Ct. at 288. Over the next three months he saw medical personnel at the prison on 17 different occasions for his ailments. Specifically, the "doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants, and pain relievers." *Id.* at 107, 97 S.Ct. at 292. The prisoner sued "contend[ing] that more should have been done by way of diagnosis and treatment, and suggest[ed] a number of options that were not pursued." *Id.* As to these contentions concerning the prisoner's treatment, the Supreme Court wrote "[T]he question whether an X-ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judg-

ment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." *Id.*

■ Although determining whether the prison staff's response is negligence represents a "back-door" approach to the problem—saying what deliberate indifference is not—it is nevertheless useful as a means of drawing a line in a difficult area of the law. One problem immediately apparent about this line drawing, however, is that this Court is asked to second-guess and judge the discretionary acts of governmental officials and medical personnel. With this in mind, the Third Circuit has noted that the test for deliberate indifference, as defined by the Supreme Court in *Estelle*

affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977). Implicit in this deference to prison medical authorities is the assumption that such an informed medical judgment has, in fact, been made. When, however, prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment, the constitutional standard of *Estelle* has been violated.

*Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3rd Cir.1979). Similarly, the Tenth Circuit has noted that where the medical community disagrees among themselves as to the best form of treatment and several different methods of treatment are available for a medical condition, an informed judgment as to the appropriate form of treatment does not constitute deliberate indifference. *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir.1986); *see also Ramos*, 639 F.2d at 575 ("*A fortiori*, a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the

inmate receives does not support a claim of cruel and unusual punishment."); *Layne v. Vinzant,* 657 F.2d 468, 474 (1st Cir.1981) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."); *Ferranti v. Moran,* 618 F.2d 888, 891 (1st Cir.1980) (Disagreement as to the appropriate course of treatment or a dispute over an exercise of professional judgment may be a colorable claim of negligence but it is not deliberate indifference).

With the idea of negligence versus deliberateness in mind, as well as the policy of allowing considerable latitude to prison officials where their discretionary acts are called into question, the Court is prepared to analyze the facts outlined previously with the relevant law. Simply put, the Court is persuaded that none of the defendants acted with deliberate indifference to Gomm's medical needs.

■ As to his shoulder, Gomm first complains that the prison medical staff, particularly Eric Call and Dr. Middleton, misdiagnosed and mistreated his shoulder injury, thereby subjecting him to unnecessary pain. This complaint, however, does not demonstrate deliberate indifference. A difference of opinion between the doctor and the inmate, *see McCracken v. Jones,* 562 F.2d 22, 24 (10th Cir.1977), *cert. denied,* 435 U.S. 917, 98 S.Ct. 1474, 55 L.Ed.2d 509 (1978), or even an incorrect diagnosis, *see Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 291–92, does not make out a violation of the Cruel and Unusual Punishment Clause. Call and Middleton saw Gomm on several occasions, examined him, and treated him as their medical judgment dictated. After Dr. Gordon raised concerns about the extent of Gomm's shoulder injury, Dr. Middleton performed more tests and ordered more X-rays to convince himself that his diagnosis and treatment was correct. The number of examinations by Dr. Middleton, Dr. Newman, and Dr. Gordon also point to the conclusion that Gomm was not ignored by the defendants.

Neither did Gomm demonstrate at trial that anyone in the prison medical department or in the Department of Corrections deliberately delayed Gomm from receiving adequate care for his shoulder. The Court finds that the delay in obtaining shoulder surgery for Gomm was the result of professional medical judgment and scheduling problems with specialists at the UMC. Here, as in *Estelle,* the decision not to refer Gomm to a specialist constitutes at most negligence, but certainly not deliberate indifference. Dr. Middleton and Dr. Newman both testified that conservative treatment, and not surgery, was appropriate for most of 1985 and the early part of 1986. Moreover, although Freestone or Dr. Middleton did not respond to Drs. Newman's and Gordon's concerns about post-operative care as Gomm might have wished, the Court saw or heard nothing at trial that persuades it that Dr. Middleton or Freestone deliberately attempted to delay Gomm's surgery for nonmedical reasons. Freestone's interpretation of Drs. Newman's and Gordon's letters that surgery should not be performed was reasonable, albeit perhaps inaccurate, but no more than negligent. His and Dr. Middleton's failure to follow-up or communicate with Dr. Gordon and Dr. Newman also does not demonstrate deliberate indifference. They believed that Dr. Newman and Dr. Gordon had told them unequivocally that Gomm would not benefit from surgery while in prison. While follow-up may have been the best course of action, Freestone's and Dr. Middleton's inaction is entitled to deference as they were exercising their professional judgment. *Pierce,* 612 F.2d at 762.

Gomm also attempted to show that the defendants delayed his surgery until they were satisfied that Gomm would pay for the surgery. However, Gomm did not demonstrate with reliable evidence that this was the prison's intent. Freestone testified that inmates receive medical care regardless of their ability to pay, Freestone, V at 70, and the facts of this case bear this statement out. While it is true that the prison asked the Gomms to utilize their insurance to pay for Gomm's medical care where possible, this fact alone does not

demonstrate deliberate indifference. Gomm did not establish that asking for assurances as to payment for medical services adversely affected him or improperly delayed surgery from taking place. Especially here, where the prison medical staff disputed the need for surgery, Freestone and the other members of the USP were entitled to insist on payment for surgery they administratively and medically deemed "elective." [35]

Concerning the December, 1985 surgery, Mrs. Gomm apparently decided not to proceed with this surgery after Freestone informed her that Gomm would have to pay for a guard during the surgery because the Gomms wanted to use a hospital other than the UMC. Because of Gomm's status at the prison at the time, requiring a guard to accompany him while out of the prison was prudent, within the judgment of prison officials, and does not constitute cruel and unusual punishment. Once again, this is especially true where prison medical personnel did not believe that surgery was required at this point.

■ The Court also finds that Warden Cook did not act with deliberate indifference toward Gomm. The allegations against Warden Cook focus on Warden Cook's refusal to allow Dr. Gordon to perform Gomm's shoulder surgery in December, 1985. Both Warden Cook and Gary DeLand testified that Warden Cook did not have the authority to order surgery for Gomm. Although Mrs. Gomm's testimony differed from Warden Cook's as to the scheduling of surgery with Dr. Gordon in December, 1985, this alone does not prove that Warden Cook knew of Gomm's need for surgery or that Warden Cook deliberately delayed Gomm's surgery date. Warden Cook, like Freestone, was entitled to rely on the medical judgment of the prison medical staff in conjunction with doctors at the UMC, particularly where he had no direct authority to ensure that Gomm's medical needs were met.

As to Gomm's post-operative care at the UMC following the shoulder surgery, the Court finds that Gomm received adequate care. Freestone testified, and the Court accepts as true, that Gomm either went to his scheduled therapy appointment or that Freestone received permission from the UMC to reschedule the appointment. Freestone, V at 27–28.

Gomm's complaints about the method in which he was transported also must fail. As noted earlier, Freestone, Dr. Middleton, and the transportation officers all testified that they had not seen the prescription from Dr. Newman concerning Gomm's restraints. Furthermore, several of the transportation officers testified about the method by which a doctor could request special transportation, but also stated that they never received special orders concerning Gomm. The transportation officers were credible witnesses, and the Court has no reason to suspect that the officers would not have complied with Dr. Newman's prescription had their orders been to do so. Barring a complete conspiracy among all who testified concerning this issue (and no persuasive evidence of this has been shown), the only reasonable inference that can be drawn is that Dr. Newman's prescription was misplaced by someone in the medical department. Misplacing or misfiling the prescription, without proof as to who misplaced or misfiled it, or why they did so, constitutes at most negligence, not deliberate indifference.

Turning now to Gomm's back complaints, it is also clear that none of the defendants acted with deliberate indifference with regard to Gomm's back ailments. Dr. Middleton testified that he performed numerous examinations of Gomm's back, detailing exactly what tests he performed. The results of these tests convinced Dr. Middleton that Gomm did not need surgery or to see a specialist. Middleton, VII at 105. Although Gomm may dispute this diagno-

**35.** This conclusion concerning the prison's requests for the Gomms to pay for the surgery is equally true as to Gomm's out of prison treatment for his back problems. Freestone testified that he was prepared to have the back surgery performed at the UMC at state expense, but at Mrs. Gomm's request allowed Dr. Gordon to perform the surgery at St. Mark's Hospital. Freestone, V at 65.

sis, he did not offer expert testimony establishing that Dr. Middleton's examinations were deficient or that his conclusions were wrong.[36] Simply put, Gomm disagreed with Dr. Middleton's diagnosis. As the *Estelle* court noted, disagreement over diagnosis is not deliberate indifference. *See Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 291–92.

■ Concerning Gomm's back, Freestone's actions are not subject to attack. After Dr. Schackel, a prison doctor, recommended that Gomm see a specialist for his back problem, Freestone did not in any way delay Gomm from seeing Dr. Gordon. Furthermore, in the spring of 1988, after Dr. Gordon informed Freestone that Gomm needed back surgery, Freestone obtained a second opinion from the UMC. Although Gomm complains that obtaining a second opinion resulted in delay, Gomm did not offer testimony that Freestone's consultation request to the UMC was not prudent. Freestone testified that the medical department's policy concerning private physicians was to evaluate what the private physician recommended and then arrive at its own conclusion. This policy, and the delay it may have caused in this case do not offend the Eighth Amendment. Moreover, the day after Dr. Fults, the UMC doctor, recommended surgery, someone in the medical department actually scheduled surgery with Dr. Fults. V at 62; Plaintiff's Exhibit 76. This action is evidence that Freestone, as administrator of the medical department, did not intentionally delay Gomm's back surgery. Additionally, any delay from the time Gomm began seeing UMC doctors concerning his back until the time surgery was performed was due not to any indifference on Freestone's part, but to scheduling delays with the UMC and allowance for the time needed by the UMC doctors to arrive at a diagnosis and treatment plan.

Finally, it is important to note that Freestone relied on the Inspector General's office for legal advice concerning Gomm's complaints. *See* VI at 53. While this point is not dispositive, it provides further evidence that Freestone did not intentionally withhold medical care from Gomm, but instead sought to provide what the Constitution requires.

■ The only defendant that remains is Gary DeLand, the Director of the Utah State Department of Corrections. Because Gomm did not show that DeLand was personally involved with the events Gomm complains of, DeLand cannot be held liable. Furthermore, Gomm did not show that DeLand directed the actions of the medical department as to the specific policies and practices used in this case. *See Daniels v. Gilbreath*, 668 F.2d 477, 480–81 (10th Cir. 1982) (stating that § 1983 requires a showing of proximate causation). Instead, Gomm attempted to prove that DeLand should be held liable as a supervisor. As the Tenth Circuit has pointed out, however, supervisory liability requires a showing that the prisoner's constitutional rights have been deprived. "A supervisor is not liable under section 1983 unless an 'affirmative link' exists between the [constitutional] deprivation and either the supervisor's 'personal participation, his exercise of control or direction, or his failure to supervise.'" *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir.1988) (citations omitted). Because the Court has already held that the acts Gomm complains of do not violate the Eighth Amendment's prohibition against cruel and unusual punishment, *a fortiori*, DeLand cannot be held liable. Without any constitutional violation, the failure to adequately supervise does not offend the Constitution. Furthermore, because the Court sees no other reason to impose liability on DeLand as a supervisor, the Court holds in favor of Director DeLand.

## CONCLUSION

Although the state has a duty to provide adequate medical care to its inmates, the Constitution does not require perfect treat-

---

**36.** Dr. Gordon's testimony did not demonstrate that the tests Dr. Middleton performed were deficient or that Dr. Middleton should have performed further tests when examining Gomm at the prison.

ment. As the Tenth Circuit has noted, prison officials "do not guarantee that the prisoners receive absolutely correct medical treatment, as there is no such thing, and everyone takes a risk as to diagnosis and treatment." *McCracken*, 562 F.2d at 24–25. Gomm's complaints essentially boil down to a disagreement over his treatment. Despite Mr. Gomm's contentions, the Court is persuaded that, as to each and every defendant, nothing introduced at trial by way of testimony or otherwise demonstrates that any defendant violated the prohibition of cruel and unusual punishment contained in the Eighth Amendment. Balancing the evidence the Court heard at trial, it is manifest that Gomm did not meet his burden of proving by a preponderance of the evidence that any defendant violated his constitutional rights. The Court will accordingly enter judgment in favor of the defendants.

IT IS SO ORDERED.